1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11

FRANK J. FERNANDEZ,
CDCR# D-61222,

                                   Plaintiff,

    v.

E. DUARTE; R. MADDEN;
J. SAIS; J. BONILLAS;
E. MATUS; A. ACUNA; J. JIMENEZ,

                                   Defendants.

Case No. 22-cv-0446-BAS-WVG

**ORDER:**

**(1)  DISMISSING CLAIMS AND DEFENDANTS PURSUANT TO 28 U.S.C. § 1915(e)(2)(B) & 1915A; AND**

**(2)  DIRECTING USMS TO EFFECT SERVICE OF REMAINING CLAIMS IN FIRST AMENDED COMPLAINT**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        On April 4, 2022, Frank Fernandez ("Fernandez"), who is currently incarcerated at Pelican Bay State Prison ("PBSP"), and is proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983").  (*See generally* Compl., ECF No. 1.)  He simultaneously moved to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915(a) and for appointment of counsel.  (ECF Nos. 2, 3.)  This Court granted Fernandez's IFP Application, denied Fernandez's request for appointment of counsel, and conducted a pre-answer screen of the initial Complaint as required under 28 U.S.C. § 1915A and §

- 1 -

1915(e)(2)(B).  (*See* Order, ECF No. 5.)  That screen revealed Fernandez had alleged sufficient factual content to state a First Amendment retaliation claim against one of the several named Defendants, but that Fernandez's remaining claims under the First, Eighth, and Fourteenth Amendments against the remaining Defendants were deficient.  (*See id.*)  This Court dismissed Fernandez's defective claims with leave to amend.  (*See id.*)

Now before the Court is Fernandez's Amended Complaint.  (*See generally* Am. Compl., ECF No. 8.)  Because Fernandez is a prisoner and is proceeding IFP, the Court again must conduct a pre-answer screening.  *See Chavez v. Robinson*, 817 F.3d 1162, 1168 (9th Cir. 2006).  For the reasons set forth below, this Court concludes that Fernandez still states only a First Amendment retaliation claim against Defendant E. Duarte, despite his attempts to cure the issues that plague his remaining claims.

## I.    BACKGROUND

The Court presumes the parties' familiarity with the facts and procedural history of this matter, which is set forth in detail in this Court's initial pre-answer screening Order.  (*See* ECF No. 5.)  For this § 1915 screening, the presumption of truthfulness attaches to the factual allegations in the Amended Complaint, and the Court draws all reasonable inferences therefrom in Fernandez's favor.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

### A.    Fernandez Complains of Duarte's Purported Misconduct

In the Summer of 2019, Fernandez was being confined in Centinela State Prison ("CEN").  (Am. Compl. ¶ 1.)  There, he served in leadership positions on at least two inmate-liaison committees; he was the Chairman of the "Institutional Advisory Committee" ("IAC") and a member of the "Men's Advisory Committee."  (*Id.* ¶ 4.)  In these positions, Fernandez assisted in fostering positive relations between CEN staff and inmates.  (*Id.*)

In approximately June 2019, a verbal spat broke out between an inmate and a correctional officer.  (Am. Compl. ¶ 1.)  News of the incident ultimately reached Defendant Captain J. Sais ("Sais"), who initiated a "threat assessment" to determine whether the

correctional officer involved was in physical danger, and removed the correctional officer from his post pending that assessment. (*Id.* ¶¶ 2–3.) As part of this threat assessment, Sais met with members of the MAC, including Fernandez. (*Id.* ¶ 5.) During that meeting, Fernandez vocalized that it was "well known" among inmates the correctional officer involved in the altercation "was belligerent and disrespectful," and that inmates were generally pleased the officer had been removed from his post. (*Id.*) Fernandez opined, in sum, that inmates did not pose any threat towards correctional staff. (*Id.*)

Shortly thereafter, Sais called upon Fernandez for a second meeting. (Am. Compl. ¶ 6.) Defendant Lieutenant E. Duarte ("Duarte") and another correctional officer approached Fernandez while on his way to see Sais. (*Id.* ¶¶ 7–8.) The officers blocked Fernandez's path and took "aggressive, opposing stance[s] towards him," causing him to feel "threatened and uncomfortable." (*Id.*) Duarte told Fernandez he wanted to address a "threat on staff" about which he had heard a rumor. (*Id.* ¶ 9.) Fernandez denied knowing of any threat posed to correctional staff by inmates, in response to which Duarte stated, "We all know it takes the ok of a big homie to assault the staff." (*Id.* ¶ 10.) Fernandez interpreted Duarte's statement as an accusation that he, as Chairman of IAC, had authorized inmates to act violently toward CEN correctional staff. (*Id.*) Fernandez rebuffed the insinuation, stating, "[S]top trying to twist this around as a threat on staff, it was [the correctional officer] who was positing a threat to this inmate." (*Id.*) Fernandez observed Duarte grow "agitated and upset by [his] response," and went on his way. (*Id.* ¶ 11.)

The next day, two correctional officers confronted Fernandez about a rumor that he had given inmates permission "to assault staff who are disrespectful." (Am. Compl. ¶¶ 12–13.) One of these officers told Fernandez this intel had come from Duarte. (*Id.* ¶ 12.) Fernandez denied the rumor as flatly false to both correctional officers. (*Id.* ¶¶ 12–13.) Concerned that Duarte was propagating rumors about him to correctional staff and, in doing so, was "create[ing] a hostile environment," Fernandez "immediately informed Sais of Duarte's purported misconduct. (*Id.* ¶ 14.)

//

### B.    Fernandez's Implication in an Escape Plot

Unbeknownst to Fernandez, on approximately June 23 or 24, 2019, the Investigative Services Unit ("ISU") at CEN discovered a hand-written note describing an escape plot. (Am. Compl. ¶ 23.)  Around that same time, ISU purportedly obtained information from a "confidential informant" corroborating this plot and, moreover, implicating Fernandez as one of its main participants.  (*Id.*; *see also* Confidential Information Disclosure Form, Ex. B to Am. Compl., ECF No. 8-2.)  According to a Confidential Information Disclosure Form, completed and filled out by a member of the ISU and detailing the information provided by the confidential source, Fernandez—along with two other inmates—planned to incite a race riot to create a distraction that would allow them to abscond from CEN. (*See* Confidential Information Disclosure Form.)  The informant further relayed that Fernandez and his co-participants were prepared to use force against correctional staff if necessary.  (*Id.*)  The informant also indicated that one of the other participants in the escape plan had been getting assistance from Mexican Mafia members outside CEN, who had been flying drones over CEN for several months to, *inter alia*, "get information about the prison layout."  (*Id.*)

However, according to Fernandez, this information did not come from a confidential ISU source.  (Am. Compl. ¶ 23.)  Rather, Duarte purportedly fabricated Fernandez's involvement in an escape plot "in order to retaliate" against him for complaining to Sais. (*Id.*)

### C.    Fernandez is Detained and Searched in Connection With the Escape Plot

On June 24, 2019, Defendant Correctional Officer A. Acuna ("Acuna") forcibly removed Fernandez from his cell and brought him to a holding cell located in CEN's gym. (Am. Compl. ¶ 16.)  There, Fernandez was strip searched.  (*Id.*)  Soon afterwards, Duarte arrived at the scene.  (*Id.*)  Fernandez asked Duarte why he was being detained and searched, to which Duarte responded that Fernandez was suspected of participating in an escape plot.  (*Id.*)

22cv0446

Fernandez vehemently denied the accusation.  (*Id.*)  In response, Duarte allegedly said, "I can make this or anything stick and even put more on it, if you know what I mean." (*Id.* ¶ 17.)  Fernandez then accused Duarte of harboring a "personal vendetta" against him for complaining to Sais and for the influence he yielded over CEN inmates and staff, alike, as IAC Chairman.  (*Id.* ¶ 18.)  Duarte allegedly responded by shrugging his shoulders and stating sarcastically, "I can twist things up too."  (*Id.*)  Fernandez was designated for immediate transfer to Calipatria State Prison ("CAL"), where he would be held in an administrative-segregation unit ("Ad-Seg"), "pending investigation [into] the alleged escape plot."  (*Id.* ¶ 19.)

Prior to Fernandez's transfer, Acuna undertook an inventory search of Fernandez's cell.  (Am. Compl. ¶¶ 29–30.)  That search revealed a "leatherman multipurpose tool" hidden in Fernandez's state-issued boots.  (*See id.* ¶ 29; Classification Committee Chrono at 2, Ex. E to Am. Compl., ECF No. 8-5.)  The leatherman tool consisted of a pair of pliers, a bottle opener, a file, a can opener, flat-head and Phillips-head screwdrivers, and scissors. (Am. Compl. ¶ 29.)  This discovery prompted Acuna to complete and file a Rules Violation Report on June 28, 2019, which formed the basis for a "possession of a deadly weapon" charge against Fernandez.  (*Id.* ¶ 30.)

Fernandez alleges Acuna purposefully misclassified the leatherman tool as a "deadly weapon," despite the tool lacking a "blade" or "knife," in order to overcharge Fernandez (Am. Compl. ¶ 30. (alleging the appropriate charge would have been for "possession of contraband," a lesser violation).)  Fernandez avers Acuna conspired to do so with Sais, Duarte, and Defendants Correctional Officers J. Bonillas ("Bonillas") and E. Matus ("Matus"), in retaliation for Fernandez's complaints to Sais about Duarte.  (*Id.* ¶¶ 31.) Specifically, Fernandez claims those Defendants all congregated in the CEN gym immediately before Acuna's inventory search and were united in their hatred for him.  (*Id.* ¶ 31 (alleging Defendants were resentful of Fernandez "as being the IAC Chairman who had much respect and influ[ence] within the inmate population and among a lot of staff and administration, with much latitude to move around the prison").)

22cv0446

### D.    RVR Hearing and Conviction

Fernandez was transferred from CEN to CAL on approximately June 24, 2019.  (Am. Compl. ¶ 29.)  He was placed in Ad-Seg, where he remained for the duration of his stay at CAL.  (Am. Compl. ¶ 19; *see also* Classification Committee Chrono at 2.)  Approximately one month later, disciplinary proceedings for Fernandez's possession-of-a-deadly-weapon charge commenced.  (Am. Compl. ¶ 19.)

Defendant Lieutenant Jimenez ("Jimenez") presided over an RVR hearing on July 30, 2019.  (Am. Compl. ¶ 34.)  Fernandez inquired during the RVR hearing whether he could view the "actual evidence," *i.e.*, photographs of the tool Acuna confiscated from his cell, "on the computer."  (*Id.*)  Jimenez denied this request on the grounds that the digitized images were located at CEN and that a photograph of the tool was appended to the RVR itself.  (*Id.*)  Fernandez then sought postponement of the RVR hearing until the digitized images could be transferred from CEN to CAL.  (*See id.*)  Jimenez denied this request, too. (*Id.*)  The RVR hearing, thus, proceeded as scheduled.  (*Id.*)

Fernandez pleaded not guilty to the charges pressed against him.  (Am. Compl. ¶ 35.)  In his defense, he admitted to possession of the leatherman tool at issue, but argued that the tool did not contain either a knife or a blade and, thus, could not support a conviction for possession of a deadly weapon.  (*See id.*)  Fernandez's defense was unsuccessful, and he was convicted of the crime for which he stood charged.  (*See id.* ¶ 45.)  As punishment, Fernandez was sentenced to a 7-month term in the Special Housing Unit and assessed a 360-day credit loss.  (*Id.*)

### E.    Fernandez's Adverse Transfer

The California Department of Corrections and Rehabilitation ("CDCR") deploys a "classification process" pursuant to which it "examine[s] and studie[s]" newly committed inmates in order assign inmates to "the institution of the appropriate security level and gender population nearest the prisoner's home," *i.e.*, "a place where the prisoner's spouse, parents, or children reside at the time of commitment," unless "other classification factors make such a placement unreasonable."  Cal. Penal Code § 5068.  The CDCR has

- 6 -

promulgated a regulatory regime that governs this classification process.  *See* 15 Cal. Code Regs. § 3375 *et seq.*  Under this scheme, "a classification committee composed of staff knowledgeable in the classification process" wield the authority to carry out the classification process.  *Id.* § 3375(c).  California law provides that an inmate "may be reexamined" under the classification process to determine whether a new assignment is warranted.  Cal. Penal Code § 5068.

Fernandez's disciplinary charge and his subsequent conviction, as well as his alleged involvement in an escape plot, triggered reexamination of his classification status.  (Am. Compl. ¶¶ 21, 27.)   Consistent with CDCR's regulations, Fernandez attended a pre-classification committee interview with Captain Solis when he was transferred to CAL. (*Id.* ¶ 20.)  During that interview, Fernandez adamantly refuted his involvement in any purported escape plot.  (*Id.*)  A classification committee convened for an initial hearing in July 2019, during which Fernandez again disclaimed his involvement in an escape plot and accused Duarte of fabricating the allegations against him.  (*Id.* ¶ 21.)  The classification committee did not make any adverse-transfer determination at this initial hearing.  (*See id.*).

The classification committee reconvened on September 19, 2019, despite Fernandez's claim he did not receive written notice 72 hours in advance, as required under 15 Cal. Code Regs. § 3375(f)(1).[1]  (Classification Committee Grievance, Ex. E to Am. Compl., ECF No. 8-5.)  Ultimately, the classification committee determined to adversely transfer Fernandez from CAL to a CDCR facility with 180-degree design housing units.[2] (Classification Committee Chrono at 2.)   Furthermore, the classification committee

---

[1] The Court notes that the Classification Committee Chronology states Fernandez did receive written notice of his hearing 72 hours beforehand.  However, at this stage, the presumption of truthfulness attaches to all Fernandez's factual allegations.  *See Meyer*, 373 F.3d at 1039.

[2] In 180-degree design housing, the "cellblocks are partitioned into three separate, self-contained sections, forming a half circle (180 degrees)."  *See* Office of the Inspector General, *2015 Special Review: High Desert State Prison*, *available at* https://www.oig.ca.gov/wp-content/uploads/2019/05/2015_Special_Review_-_High_Desert_State_Prison.pdf; *see also Woods v. Greenpoint Mortg. Funding, Inc.*, No. Civ. 2:09-1810 WBS KJM, 2010 WL 3033931, at *2 (E.D. Cal. July 28, 2010) (noting courts "frequently take judicial notice of documents on government websites pursuant to Federal Rule of Evidence 201(b)")

determined Fernandez needed to be housed in an "institution located in the Northern part of California away from the Mexican Border." (*Id.*) Accordingly, the classification committee ordered Fernandez's transfer to High Desert State Prison ("HDSP") or, alternatively, California State Prison, Sacramento ("SAC"). (*Id.*)

The Classification Committee Chronology, which details the committee's transfer deliberation and determination, reveals the committee considered the following factors:

- Fernandez's classification under CDCR's Security Threat Group Prevention program as a validated member of the Mexican Mafia;

- Information obtained by ISU that Fernandez was "involved in a conspiracy to escape from the custody of [CDCR] . . . by the way of [v]iolence"; and

- Fernandez's conviction for an A-1 or A-1 offense of possession of a deadly weapon.

(Classification Committee Chrono at 1–2.)

CDCR transferred Fernandez to HDSP and then, at some unspecified time, to PBSP. (Am. Compl. ¶ 39.) Fernandez alleges that prior to the transfer he "was reconnecting with family and loved ones, who all live in [S]outhern [C]alifornia and [A]rizona, in hopes of receiving visits." (*Id.*) However, those hopes were dashed by his transfer to facilities located in Northern California, where his family cannot afford travel. (*Id.*) Furthermore, his confinement in HDSP and PBSP have been more restrictive than his confinement at CEN because he now has limited access to the rehabilitative, extracurricular, and educational programs he once enjoyed. (*Id.*)

### F.   Fernandez's Numerous Grievances

Fernandez has filed at least four administrative grievances, each of which is annexed to the Amended Complaint. He filed two grievances against Duarte, complaining that Duarte had spread false rumors about him and contesting the ISU's investigation into the escape plot as fabricated by Duarte (First Duarte Grievance, Ex. A to Am. Compl., ECF No. 8-1; Second Duarte Grievance, Ex. B to Am. Compl., ECF No. 8-2); a grievance

22cv0446

against Acuna, contesting the accuracy of the RVR (Acuna Grievance, Ex. C to Am. Compl., ECF No. 8-3); a grievance against Jimenez, contesting the RVR hearing as procedurally deficient (Jimenez Grievance, Ex. D to Am. Compl., ECF No. 8-4); and a grievance against the classification committee, contesting his assignment to HDSP as arbitrary, capricious, and without adequate process (Classification Committee Grievance, Ex. E to Am. Compl., ECF No. 8-5). All four grievances were denied. Fernandez appealed each to exhaustion.

Fernandez avers that Defendant Warden Madden ("Madden") was the final arbiter of his Duarte and Acuna Grievances. (Am. Compl. ¶¶ 50–53.) He claims that Madden's dismissal of these Grievances and his purported failure to investigate thoroughly the underlying allegations in those complaints ultimately led to Fernandez's purportedly wrongful conviction and adverse transfer to CDCR facilities in the Northern part of the State. (*See id.*)

### G.  The Amended Complaint's Legal Claims

The Court construes the Amended Complaint as asserting four claims pursuant to 42 U.S.C. § 1983: (1) a First Amendment retaliation claim against Duarte; (2) a conspiracy claim against Duarte, Acuna, Sais, Bonillas, and Matus; (3) an Eighth Amendment claim against Duarte, Acuna, Sais, Bonillas, Matus, Jimenez, and Madden; and (4) a Fourteenth Amendment procedural due process claim against Duarte, Acuna, Sais, Bonillas, Matus, Jimenez, and Madden. While these claims generally overlap with those lodged in the initial Complaint, the Amended Complaint *does not* name as Defendants or assert claims against Lieutenant D. Loop ("Loop") or Chief Deputy Warden J. Hill ("Hill").

The relief the Amended Complaint seeks also largely overlaps with the relief sought in the initial Complaint. Fernandez seeks injunctive relief in the form of an order (1) expunging his disciplinary conviction and (2) transferring him from PBSP to a center closer to his family. Fernandez also requests the Court award him unspecified compensatory and punitive damages. (Am. Compl. at p. 9.)

//

22cv0446

## II.     LEGAL STANDARD

### A.     Screening Pursuant to 28 U.S.C. § 1915A and § 1915(e)(2)(B)

Sections 1915(e)(2) and 1915A require this Court to review and *sua sponte* dismiss an IFP complaint, and any complaint filed by a prisoner seeking redress from a governmental entity, or officer or employee of a governmental entity, which is frivolous, malicious, fails to state a claim, or seeks damages from defendants who are immune.  *See Lopez v. Smith*, 203 F.3d 1122, 1126–27 (9th Cir. 2000) (en banc) (discussing 28 U.S.C. § 1915(e)(2)); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010) (discussing 28 U.S.C. § 1915A(b)).  "The purpose of [screening] is 'to ensure that the targets of frivolous or malicious suits need not bear the expense of responding.'"  *Nordstrom v. Ryan*, 762 F.3d 903, 920 n.1 (9th Cir. 2014) (quoting *Wheeler v. Wexford Health Sources, Inc.,* 689 F.3d 680, 681 (7th Cir. 2012)).

"The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure [("Rule")] 12(b)(6) standard for failure to state a claim."  *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (noting that screening pursuant to § 1915A "incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)").  Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Wilhelm*, 680 F.3d at 1121.

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*  The "mere possibility of misconduct" or "unadorned,

22cv0446

the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

**B.    42 U.S.C. § 1983**

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).   Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks and citations omitted).   "To establish [Section] 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).

Notably, Section 1983 does not enable vicarious liability.   *Palmer v. Sanderson*, 9 F.3d 1433, 1437–38 (9th Cir. 1993).   Rather, in the context of Section 1983, a plaintiff "must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."   *Iqbal*, 556 U.S. at 676; *see also Jones v. Cmty. Redevelopment Agency of L.A.*, 733 F.2d 646, 649 (9th Cir. 1984) (instructing that even *pro se* plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in" to state a claim).   "A plaintiff must allege facts, not simply conclusions, t[o] show that [each defendant] was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).   Put differently, to establish liability against a supervisory defendant under Section 1983, a plaintiff must adequately allege that the official was personally involved in the constitutional deprivations at issue *or* "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018); *see Estate of Brooks ex rel. Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) ("Causation is, of course, a required element of a § 1983 claim.").

- 11 -

### III.   ANALYSIS

The Court is now tasked with screening the Amended Complaint.   It begins its analysis by assessing the lone viable claim it already determined Fernandez had successfully stated in his initial Complaint:  his First Amendment retaliation claim against Duarte.   It then proceeds to analyze whether the Amended Complaint has successfully cured the deficiencies that felled Fernandez's remaining claims.

### A.   Retaliation Claim Against Duarte

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison*, 668 F.3d at 114 (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).   "That prison inmates do not have all the constitutional rights of citizens in society—and may hold some constitutional rights in diluted form—does not permit prison officials to frustrate vindication of those rights which are enjoyed by inmates." *Nolan v. Scafati*, 430 F.2d 548, 551 (1st Cir. 1970).   "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68.

In its initial pre-answer screening Order, this Court concluded the original Complaint contained factual allegations supporting each of these essential elements.   Specifically, it wrote:

> The Complaint alleges that Duarte fabricated Plaintiff's involvement in an "escape plot" because Plaintiff had reported to Sais that Duarte was spreading purportedly false rumors about Plaintiff's involvement with threats other inmates directed towards CEN correctional officers, satisfying the first three elements of a retaliation claim in the prison context.  (Compl. ¶¶ 60–61); *see Rhodes*, 408 F.3d at 567–68.   The Complaint further satisfies the final two requisite elements of a retaliation claim because it alleges (a) that Duarte's accusations chilled Plaintiff's First Amendment rights because it resulted in him being transferred to CAL, where he was housed in Ad-Seg . . . , and (b) that Plaintiff's transfer to Ad-Seg lacked any "legitimate correctional" basis

because it was predicated upon Duarte's false accusations.  (*See* [Compl.] ¶ 62); *see Rhodes*, 408 F.3d at 567–68.

(Order at 10.)

The Amended Complaint's allegations concerning Duarte's purported retaliation are substantially identical to those set forth in the initial Complaint. (*Compare* Compl. ¶¶ 60–62 *with* Am. Compl. ¶¶ 16–19.)  Hence, for precisely the same reasons provided in the initial pre-answer screening Order, the Amended Complaint adequately states a First Amendment retaliation claim against Duarte that surpasses the low threshold applicable at 28 U.S.C. § 1915A and § 1915(e)(2)(B).  (*See* Order at 10.)

### B.    Claims Against Hill and Loop

As explained in this Court's initial pre-answer screening order, "A[n] amended pleading supersedes the original."  *Hal Roach Studios, Inc.*, 896 F.2d at 1546; (Order at 19.)  Thus, claims dismissed with leave to amend that are not re-alleged in a subsequent amended pleading may be "considered waived if not [repleaded]." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012).  The Court warned Fernandez about these repercussions in its prior Order.  Nevertheless, the Amended Complaint does not assert any claims against Hill or Loop, who were named Defendants in the initial Complaint.   Accordingly, Fernandez's Eighth and Fourteenth Amendment claims against Hill and Loop are deemed waived and those Defendants are dismissed from the action.

### C.    Conspiracy Claim

To establish a claim under Section 1983 that prison officials conspired to infringe upon a constitutional right, a plaintiff must satisfy the following elements:  (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights; and (2) an actual deprivation of those rights resulting from that agreement.  *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010).  The initial Complaint alleged Acuna, Duarte, Sais, Bonillas, and Matus conspired with one another to retaliate against Fernandez for complaining to Sais about Duarte's purported misconduct, in violation of Fernandez's First Amendment rights.  (Compl. ¶ 44, ECF No. 1.)  It averred

those Defendants did so by agreeing to falsify the RVR to support charging Fernandez with a disciplinary violation—possession of a deadly weapon—he claims he did not commit. (*Id.*)   The Court concluded Fernandez's conspiracy claim failed for two independent reasons.   First, the Court held it could not infer an "agreement" or "meeting of the minds" from the initial Complaint's mere allegation the purported co-conspirator Defendants all were in the same place at the same time immediately before Acuna inventoried Fernandez's belongings.   Second, and more fundamentally, the Court found *Heck v. Humphrey*, 512 U.S. 477 (1994) ("*Heck*) appeared to foreclose Fernandez's conspiracy claim.   The allegations in the Amended Complaint confirm that Fernandez's conspiracy claim is barred by *Heck*.

In *Heck*, the Supreme Court held that where a Section 1983 action, if meritorious, "would necessarily imply the invalidity of [a] conviction or sentence," a plaintiff first "must prove that the conviction or sentence has been" reversed on appeal, expunged, or otherwise invalidated in a direct challenge before the appropriate State tribunal.   512 U.S. at 486–87; *see Flores-Haro v. Slade*, 160 F. Supp. 3d 1231, 1234 (D. Or. 2016) ("[T]he *heck* doctrine protects comity, federalism, and finality and avoids parallel litigation."), *aff'd in part, rev'd in part*, 686 F. App'x 454 (2017).   This doctrine, known as the *Heck* bar, applies with equal force to "internal prison proceedings."   *Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005).

It is crystal clear from the Amended Complaint that Fernandez's conspiracy claim is a *de facto* challenge to his possession-of-a-deadly weapon charge and conviction.   Again, Fernandez alleges Acuna conspired with Duarte, Sais, Bonillas, and Matus to overcharge Fernandez by falsely exaggerating the dangerousness of the leatherman tool Acuna discovered in Fernandez's cell.   If successful on this count, Fernandez would draw into question the factual underpinnings of his disciplinary conviction rendered after his RVR hearing.   Hence, the *Heck* bar permits Fernandez to raise this claim collaterally in federal court *only* if he is able to demonstrate he previously secured some ruling from the relevant State tribunal that disposed of his disciplinary conviction.   *See Heck*, 512 U.S. at 486–87.

22cv0446

But Fernandez expressly alleges in his Amended Complaint that he failed to secure such a ruling.  Indeed, Fernandez sought to challenge his underlying disciplinary conviction in both his Acuna and Jimenez Grievances.  Those Grievances were both denied after the full appeals process.

Because Fernandez's disciplinary conviction still stands, the *Heck* bar forecloses Fernandez from proceeding with the conspiracy claim alleged in his Amended Compliant.

### D.   Eighth Amendment Claim

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted).  To state an Eighth Amendment claim, a plaintiff must satisfy both the objective and subjective components of a two-part test.  *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002).  First, he must allege defendants deprived him of the "'minimal civilized measure of life's necessities.'" *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Wilson*, 501 U.S. at 304).  When determining whether an alleged deprivation is objectively sufficiently serious to support an Eighth Amendment claim, the court must consider the circumstances, nature, and duration of the deprivation. *See Johnson v. Lewis*, 217 F.3d 726, 731–32 (9th Cir. 2000).  Second, the plaintiff must allege facts sufficient to plausibly show each defendant he seeks to hold liable had a "sufficiently culpable mind." *Wilson*, 501 U.S. at 297.

Fernandez's Eighth Amendment claim appears to rest upon two separate theories. First, Fernandez presses an Eighth Amendment claim for false imprisonment or wrongful conviction, averring that his transfer to more restrictive conditions of confinement— namely, to CAL's Ad-Seg and, subsequently, to HDSP and PBSP—were premised upon fabricated allegations of wrongdoing and, thus, amounts to "cruel and unusual punishment."  But this theory is foreclosed by the *Heck* bar.  Fernandez's transfer to more restrictive conditions was prompted, in large part, by his disciplinary conviction.  (*See* Classification Chrono at 2 (predicating decision to hold Fernandez in Ad-Seg and to

- 15 -

transfer to HDSP upon Fernandez's conviction for "an A-1 or A-2 offense").   Were Fernandez to prevail on this variant of his Eighth Amendment claim, it would effectively repudiate his disciplinary conviction, thus running afoul of the *Heck* bar.   Hence, Fernandez's Eighth Amendment claim for false imprisonment or wrongful conviction fails.

Second, Fernandez appears to aver the conditions he has endured at HDSP and PBSP are cruel and unusual.  But Fernandez does not allege any facts that give rise to a reasonable inference he has been deprived of "life's necessities" during his confinement at those institutions.  *See Frost*, 152 F.3d at 1128.   The "minimal civilized measure of life's necessities" includes "adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson*, 217 F.3d at 731.   Fernandez alleges his transfer to more restrictive facilities located in the Northern part of the State has made it impossible to receive visits from his family and has limited his access to the extracurricular, educational, and rehabilitative programs that he once enjoyed.  (Am. Compl. ¶ 39.)  But it is well-established law in this Circuit that neither of these types of deprivations rise to the level of Eighth Amendment violations.  *See Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) ("Supreme Court and Ninth Circuit precedent clearly establish[] that prisoners do not enjoy an absolute right to receive visits while incarcerated, even from family members."); *Hoptowit v. Ray*, 682 F.2d 1237, 1254–55 (9th Cir. 1982) (holding "[i]dleness and the lack of [vocational and rehabilitative] programs" does not violate the Eighth Amendment).

Accordingly, Fernandez fails to adequately allege a cognizable Eighth Amendment violation.

### E.   Fourteenth Amendment Claim

"The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law." *Meachum v. Fano*, 427 U.S. 215, 223 (1976) (citing U.S. Const. amend. XIV, § 1).  Again, Fernandez's Fourteenth Amendment claim appears to rest upon two separate theories.  Most prominently, Fernandez alleges his disciplinary conviction was borne from an RVR hearing that lacked adequate process because Jimenez denied his requests at that hearing to view images of the leatherman tool

beyond those annexed to the RVR itself.  This procedural due process claim is yet another vehicle Fernandez deploys in his Amended Complaint to assert a *de facto* challenge to his disciplinary conviction.  But, as this Court has already opined in its initial pre-answer screening Order (Order at 13–14) and twice above in the instant Order, *see supra* Sec. III.C, D, he may not pursue such a collateral challenge under *Heck*.

However, Fernandez also appears to raise a Fourteenth Amendment procedural due process claim pursuant to *Sandin v. Conner*, 515 U.S. 472 (1995), based upon the classification committee's adverse transfer determination.  (*See* Am. Compl.  ¶ 39 ("This major change and disruption in plaintiff's positive programing created an *atypical and significant* hardship on plaintiff and served no legitimate penological interest in punishing plaintiff[.]") (emphasis added).)  *Sandin* permits an inmate to challenge as lacking adequate procedural protections a State's imposition of a particular condition of confinement.  *Id.* The *Heck* bar is not applicable to *Sandin*-type procedural due process claims.  *See Ramirez v. Galaza*, 334 F.3d 850, 857 (2003) (construing *Heck* to permit Fourteenth Amendment due process claims that challenge the inmate's "conditions of confinement," as opposed to the fact or duration of confinement (citing *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999); *DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000))).  Nor is a *Sandin*-type claim necessarily doomed if the conditions of confinement about which the plaintiff-inmate complains are not commensurate with an Eighth Amendment violation.  *See Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996) ("We suggest that if [the district court] finds conditions in the IMU that violate the Eighth Amendment, the transfer to the IMU would impose 'atypical and significant hardship.'  We do not suggest, however, that the new test [under *Sandin*] is synonymous with Eighth Amendment violation.").  Rather, some "less egregious condition or combination of conditions or factors" may give rise to a procedural due process claim under *Sandin*.  *Id.*

To analyze the sufficiency of a State inmate's procedural due process claim under *Sandin*, courts employ a two-step analysis.  Courts must first determine whether the State action complained of deprived the inmate "of a constitutionally protected liberty or

property interest." *Johnson v. Ryan*, 55 F.4th 1167, 1180 (9th Cir. 2022) (citing *United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022)). "A liberty interest 'may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.'" *Id.* (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005)). Only if the court identifies an underlying liberty interest does it proceed to the second step, which entails "examin[ing] whether the deprivation was accompanied by sufficient procedural protections." *Id.* (citing *Houseco*, 22 F.4th at 851).

The seminal question here is whether Fernandez has established his adverse transfer to 180-degree design housing CDCR facilities in Northern California infringes upon a cognizable liberty interest that either is protected under the Due Process Clause itself *or* that "arise[s] from state policies or regulations." *Johnson*, 55 F.4th at 1180 (quoting *Wilkinson*, 545 U.S. at 221–22). Because the Court finds Fernandez fails to allege his adverse transfer infringes upon any liberty interest, it need not assess the second prong of the *Sandin* test to conclude Fernandez's procedural due process claim is fatally flawed.

Due Process Clause: The Court has no difficulty concluding the Due Process Clause itself does not provide Fernandez with a liberty interest against the adverse transfer imposed upon him by the classification committee. Well-established Supreme Court precedent forecloses such a finding. *See Meachum*, 427 U.S. at 223–25 ("Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another system within the state prison system. Confinement in any of the State's institutions is within the normal limits on range of custody which the conviction has authorized the State to impose."); *see also Wilkinson*, 545 U.S. at 222 ("We have held the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." (citing *Meachum*, 427 U.S. at 225)).

Doctrine of State-Created Liberty Interests: Again, the Due Process Clause is not the lone source out of which "constitutionally protected liberty or property interest[s]" emanate. *See Johnson*, 55 F.4th at 1180. Indeed, although "[t]he Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of

confinement," such an interest "may 'arise from state policies or regulations.'" *Id.* (quoting *Wilkinson*, 545 U.S. at 221–22). "However, an interest in avoiding certain conditions of confinement 'will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes *atypical and significant hardship* on an inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin*, 515 U.S. at 484) (emphasis added). Importantly, to determine whether there exists a state-created liberty interest in avoiding more restrictive conditions of confinement, courts do not look to "the language of the regulations regarding those conditions" themselves but rather look towards "the nature of those conditions." *Id.* at 1180 (quoting *Wilkinson*, 545 U.S. at 223).

Neither the Supreme Court nor the Ninth Circuit has enunciated a "baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223; *Ramirez* , 334 F.3d at 860 ("There is no single standard for determining whether a prison hardship is atypical and significant."). However, the Ninth Circuit in *Ramirez v. Galaza* identified "[t]hree guideposts cited in *Sandin's* analysis," which it has opined "provide[s] a helpful framework." 334 F.3d at 860–61. This framework calls for examining whether: "(1) the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Id.* (quoting *Sandin*, 515 U.S. at 487; citing *Keenan*, 83 F.3d at 1089).

Here, Fernandez alleges his adverse transfer to HDSP and, then, PBSP, resulted in the imposition of conditions giving rise to a liberty interest. Specifically, he alleges he lost access to educational, recreational, and rehabilitative programs he once enjoyed, and that he lost his position as IAC Chairman. He also alleges that his family cannot afford to travel to Northern California, where these facilities are located. And, although he does not

22cv0446

expressly allege so, the Classification Committee Chronology appended to his Amended Complaint reveals Fernandez is now housed in a 180-degree design unit to enable greater surveillance and control.

Even construing the Amended Complaint liberally and the allegations in Fernandez's favor, there is insufficient factual content to support a reasonable inference his adverse transfer imposed an atypical and significant hardship warranting additional Due Process protections. As an initial matter, this Court is persuaded by the analysis of other district court's interpreting Supreme Court and Ninth Circuit precedent that the loss of access to recreational and rehabilitative programs, family visits, and other prison privileges do not impose an atypical and significant hardship. *See Mitchell v. Garcia*, No. CV 17-3136, 2017 WL 11505979, at *4 (C.D. Cal. June 2, 2017) ("The loss of recreational privileges, family visits, and similar privileges does not impose an atypical and significant hardship."); *Stevens v. Robles*, No. 06CV2072-LAB (LSP), 2008 WL 667407 (S.D. Cal. Mar. 7, 2008) ("California has not created liberty interests enforceable by prisoners in either classification or in visitation.") (citing, *inter alia*, *Torricellas v. Poole*, 954 F. Supp. 1405, 1415–15 (C.D. Cal. 1997), *aff'd*, 141 F.3d 1179 (9th Cir. 1998).[3] This comports with one of the main tenets of the *Sandin* standard: that state-created liberty interests "will generally be limited to freedom from *restraint*." *See Sandin*, 515 U.S. at 484 (emphasis added).

The lone averment in the Amended Complaint respecting the actual *conditions* of Fernandez's confinement is the Classification Committee Chronology's indication that Fernandez would be confined in 180-degree design housing—as opposed to 270-degree design housing—to enable greater surveillance and control. (Classification Committee

---

[3] While it is true California Penal Code § 5068 provides that the CDCR director "shall assign a prisoner to the institution of the appropriate security level and gender population *nearest the prisoner's home*," *Sandin* instructs that such mandatory language does not amount to a State-created liberty interest. 515 U.S. at 483 ("[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause.").

Chrono at 2.)   But the Ninth Circuit's decision in *Myron v. Terhune* stands for the proposition that this averment, alone, does not suffice to show Fernandez's adverse transfer reached the level of an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."   476 F.3d 716, 718 (9th Cir. 2007).   There, a California inmate challenged his initial classification and assignment to a Level IV CDCR facility as improper, contending he should have been eligible for a less restrictive Level III institution. The inmate-plaintiff pressed, *inter alia*, a *Sandin*-type procedural due process claim, alleging the purported misclassification infringed upon a liberty interest.   The Ninth Circuit disagreed, finding significant that the pleading was bereft of any allegations "showing that the conditions at level IV differ significantly from those 'imposed upon inmates in administrative segregation and protective custody'" or that "the conditions at level IV differ significantly from those at level III." *Id.* at 718.

The Amended Complaint is similarly devoid of illustrative facts here.   Moreover, the Classification Committee Chronology annexed to the Amended Complaint belie the notion Fernandez's confinement at HDSP or PBSP rose even to the level of severity one might expect to be imposed in administrative segregation or protective custody:   it states that upon transfer to HDSP Fernandez would be placed in the prison's *general population*. (Classification Committee Chrono at 2.)   The Amended Complaint does not refute this premise or allege Fernandez's conditions became more restrictive once transferred again to PBSP.   Finally, Fernandez does not allege his adverse transfer will invariably affect the duration of his sentence.

Simply put, the conditions of Fernandez's confinement are even less restrictive than those the Supreme Court found in *Sandin* were insufficiently harsh and severe to give rise to a liberty interest. *See Sandin*, 515 U.S. at 484–85 (holding placement in administrative segregation or protective custody does not invoke a liberty interest).   Hence, wherever the baseline under *Sandin* for "atypical and significant hardship" might be drawn, the conditions of confinement to which Fernandez alleges he has been subjected fall well below it.

1   Accordingly, Fernandez fails to state a procedural due process claim that defeats the

2   pre-answer screening standard pursuant to 28 U.S.C. § 1915A and § 1915(e)(2)(B).

3   **F.    Claims Against Madden**

4   It appears that Fernandez's Section 1983 claims against Madden rest on three bases:

5   (1) his declination of the Duarte and Acuna Grievances; (2) his purported failure to prevent

6   Duarte's First Amendment violation; and (3) his purported failure to train correctional staff,

7   namely Duarte.  None of the theories upon which Fernandez relies to assert Section 1983

8   liability against Madden are availing.

9   **1.    Claims Arising out of Madden's Review of Grievances**

10   Fernandez alleges Madden infringed upon his constitutional rights by failing to

11   adequately investigate the factual underpinnings of the Duarte Grievances and failing to

12   subsequently take action by reprimanding Duarte, removing Fernandez from Ad-Seg, and

13   expunging Fernandez's disciplinary conviction.  But the Ninth Circuit has twice made

14   clear—in *Mann v. Adams*, 855 F.3d 639, 640 (9th Cir. 1988), and, again, in *Ramirez v.

15   Galaza*, 334 F.3d 850, 860 (9th Cir. 2003)—that an independent constitutional violation

16   does not arise out of a plaintiff's mere dissatisfaction with a defendant's review of an

17   administrative grievance.  *See also Dewberry v. Fulks*, No. 1:10-cv-621-LJO-GBC (PC),

18   2012 WL 967644, at *2 (E.D. Cal. Mar. 21, 2012) ("[Section 1983] liability may not be

19   based merely on Plaintiff's dissatisfaction with a decision on a subsequent administrative

20   review of a grievance of that underlying violation.").  Therefore, Fernandez is foreclosed

21   from pursuing this theory of liability against Madden.

22   **2.    Failure to Prevent a Constitutional Violation**

23   Fernandez also alleges that Madden failed to prevent Duarte's allegedly

24   unconstitutional, retaliatory conduct, despite purportedly being aware of Duarte's

25   "extensive misconduct record," about which Fernandez does not provide any detail or

26   otherwise elaborate.  (Am. Compl. ¶¶ 51, 53.)  But these boiler-plate allegations do not

27   suffice to show either Madden's "personal involvement" in or his "causal connection" to

28   Fernandez's alleged First Amendment violations.  *See Keates*, 883 F.3d at 1242–43.

- 22 -

Indeed, this theory of liability against Madden mimics that which the Supreme Court disavowed in *Ashcroft v. Iqbal*, when it held that a supervisory defendant's mere "knowledge and acquiescence [of] their subordinates'" purported constitutional violations do not form the basis for Section 1983 liability.  556 U.S. at 677.

### 3.   Failure to Train Subordinates

Finally, Fernandez appears to press a failure-to-train claim against Madden.  (*See* Am. Compl. ¶ 53 ("Warden Madden's . . . failure to train and supervise his subordinates caused these constitutional violations[.]").)

A supervisor may be liable under Section 1983 for failing to train subordinates when such failure to train amounts to deliberate indifference.  *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1988).  To establish a failure-to-train claim, a plaintiff must show that:

> in light of the duties assigned to the specific officers or employees, the need for more or different training [was] obvious, and the inadequacy was so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need.

*Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Ordinarily, a single constitutional violation by a purportedly untrained employee is insufficient to demonstrate deliberate indifference.  *Connnick v. Thompson*, 563 U.S. 51, 62 (2011).  Instead, a plaintiff must usually demonstrate "[a] pattern of similar constitutional violations by untrained employees." *Id.*  "A plaintiff might also succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip enforcement officers with specific tools to handle recurring situations.'" *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

The Amended Complaint's barebone failure-to-train allegations are insufficient to plausibly demonstrate that any particular training was inadequate or that such inadequacy

1    was the result of a deliberate choice. Accordingly, Fernandez again fails to state a

2    cognizable Section 1983 claim against Madden.

3    **IV.   LEAVE TO AMEND**

4         Because this Court has already provided Fernandez a short and plain statement of

5    the deficiencies that fell his First, Eighth, and Fourteenth Amendment claims against Sais,

6    Acuna, Jimenez, Matus, Bonillas, and Madden, and because Fernandez has been given an

7    opportunity to amend those claims to no avail, this Court finds granting further leave to

8    amend these claims would be futile. *See Gonzalez v. Planned Parenthood*, 759, F.3d 1112,

9    1116 (9th Cir. 2014) ("'Futility of amendment can, by itself, justify the denial of ... leave

10   to amend.'" (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995))); *Zucco

11   Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("[W]here the

12   plaintiff has previously been granted leave to amend and has subsequently failed to add the

13   requisite particularity to its claims, [t]he district court's discretion to deny leave to amend

14   is particularly broad." (internal quotation marks omitted) (second alteration in original)).

15   **V.   CONCLUSION AND ORDER**

16        Based on the foregoing, the Court:

17        1.    **DISMISSES** all claims against Defendants Hill and Loop as waived and

18   directs the Clerk of Court to terminate these Defendants from the docket.

19        2.    **DISMISSES** all Plaintiff's claims against Sais, Acuna, Matus, Bonillas,

20   Jimenez, and Madden, as well as his Eighth and Fourteenth Amendment claims against

21   Duarte, for failing to state a claim upon which relief may be granted pursuant to 28 U.S.C.

22   § 1915(e)(2)(B)(ii) and § 1915A(b)(1) without leave to amend.

23        3.    **DIRECTS** the Clerk to issue a summons as to Plaintiff's Amended Complaint

24   (ECF No. 8) upon Defendant Duarte for the remaining First Amendment retaliation claim

25   and forward it to Plaintiff along with a blank U.S. Marshal Form 285 for Defendant Duarte.

26   In addition, the Clerk will provide Plaintiff with a certified copy of the August 4, 2022, IFP

27   Order, a certified copy of his Amended Complaint, and the summons so that he may serve

28   Defendant. Upon receipt of this "IFP Package," Plaintiff must complete the USM Form

285 as completely and accurately as possible, include an address where Defendant Duarte may be found and/or subject to service pursuant to S.D. Cal. Civ. L.R. 4.1c., and return it to the U.S. Marshal according to the instructions the Clerk provides.

4.    **ORDERS** the U.S. Marshal to serve a copy of the Amended Complaint and summons upon Defendant Duarte upon receipt and as directed by Plaintiff on the completed USM Form 285, **and to promptly file proof of service, or proof of all attempts at service unable to be executed, with the Clerk of Court**. *See* S.D. Cal. Civ. L.R. 5.2.  All costs of that service will be advanced by the United States. *See* 28 U.S.C. § 1915(d); Fed. R. Civ. P. 4(c)(3).

5.    **ORDERS** Defendant, once served, to reply to Plaintiff's Amended Complaint within the time provided by the applicable provisions of Federal Rule of Civil Procedure 12(a). *See* 42 U.S.C. § 1997e(g)(2) (providing that while a defendant may occasionally be permitted to "waive the right to reply to any action brought by a prisoner confined in any jail, prison, or other correctional facility under section 1983," once the Court has conducted its sua sponte screening pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b), and thus, has made a preliminary determination based on the face on the pleading alone that Plaintiff has a "reasonable opportunity to prevail on the merits," defendant is required to respond).

6.    **ORDERS** Plaintiff, after service has been effected by the U.S. Marshal, to serve upon Defendant Duarte, or if appearance has been entered by counsel, upon Defendant's counsel, a copy of every further pleading, motion, or other document submitted for the Court's consideration pursuant to Fed. R. Civ. P. 5(b).  Plaintiff must include with every original document he seeks to file with the Clerk of the Court, a certificate stating the manner in which a true and correct copy of that document was served on Defendant or his counsel, and the date of that service. *See* S.D. Cal. Civ. L.R. 5.2.  Any document received by the Court which has not been properly filed with the Clerk or which fails to include a Certificate of service upon Defendant, or his counsel, may be disregarded.

**IT IS SO ORDERED.**

**DATED: April 10, 2023**

Hon. Cynthia Bashant
United States District Judge

- 25 -

22cv0446